UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

FILED

99 FEB -8 AM 10: 47



ADVOCACY CENTER FOR PERSONS
WITH DISABILITIES, INC.,

        Plaintiff,

vs.                                Case No.: 98-144-CIV-FTM-24D

MYERS KURTZ, et al.,

        Defendants.
_____/

## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

The Defendants, THOMAS V. SELLARS,[1] FRANCES GIBBONS, and KATHLEEN KEARNEY, all sued in their official capacities, come pursuant to Rule 56(b), Federal Rules of Civil Procedure, and move this Honorable Court to enter an order granting summary judgment for Defendants in the above-styled cause. As grounds therefor, Defendants would state:

### ALLEGATIONS IN THE COMPLAINT

1.    In April 1998, Plaintiff, the ADVOCACY CENTER FOR PERSONS WITH DISABILITIES, INC. (the Advocacy Center), filed a complaint seeking declaratory and injunctive relief[2] against Myers Kurtz, who was sued in his official capacity as the Administrator of the G. Pierce Wood Memorial Hospital (GPW), Frances Gibbons, who was sued in her official

---

[1]/Mr. Sellars has replaced Myers Kurtz as the Administrator for G. Pierce Wood Hospital.

[2]/Plaintiff asserts that the action is brought pursuant to Title 42 U.S.C. §1983.

capacity as the Acting District Administrator for District Eight of the Florida Department of Children and Family Services (the Department), and Edward Feaver, who was sued in his official capacity as the Secretary of the Department. (Complaint)

  2. By the Complaint, Plaintiff alleges that it is the entity designated by the State of Florida to provide "protection and advocacy" of the rights of individuals with disabilities, as provided for in the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. §10801 *et seq.* (PAIMI Act). Complaint, ¶¶16 & 17)

  3. Plaintiff alleges that, in March 1996 and in April 1996 (about two years before the instant lawsuit was filed), it made a records request under the PAIMI Act for all "incident reports from G. Pierce Wood." (Complaint, ¶30) Thereafter, HRS District Eight produced redacted copies of incident reports.[3] (Complaint, ¶31 and 32)

  4. Plaintiff further alleges that HRS refused to provide copies of any Adult Protective Services records concerning abuse, neglect and injury.[4] (Complaint, ¶31)

  5. Plaintiff further alleges that, in early 1998, D.H.[5] and E.D. died at GPW. Plaintiff asserts that D.H. died because he did not receive timely medical attention for severe abdominal

---

[3]/The patient names, medical conditions, symptoms and diagnoses were redacted from the records, when they were initially supplied. (Complaint, ¶35)

[4]/Although Plaintiff allege that HRS "refused to provide copies" of the records, they do not allege anywhere in their Complaint that they actually asked for such records. (Complaint)

[5]/To protect the privacy rights of the patients and their families, the individuals whom the Advocacy Center have identified by full names in their Complaint will be identified by initials here only.

2

pain. Plaintiff asserts that E.D. died of head injuries and trauma inflicted by other persons. (Complaint, ¶40)

6. Plaintiff further alleges that Defendants have refused to allow Plaintiff to have access to the mortality review committee reports prepared by GPW staff regarding the deaths of E.D. and D.H., and will not disclose any mortality review committee reports concerning the deaths of any persons confined at GPW.[6] (Complaint, ¶41)

7. Finally, Plaintiff asserts that, while it was conducting an on-site investigation into the death of E.D., Defendant Myers Kurtz denied Plaintiff's employees unaccompanied access to areas at GPW where persons were confined and areas used by persons confined at GPW. (Complaint, ¶45) Further, Plaintiff asserts that, at the same time, they were prohibited by counsel for Defendants, Sandra Upchurch, Assistant Attorney General, from speaking with any persons confined at GPW unless the conversation pertained to E.D., on the ground that Plaintiff did not provide advance notice of its intent to speak with persons confined at GPW, except in regard to the death investigation. (Complaint, ¶46)

8. Plaintiff alleges that Defendants have violated the provisions of Title 42 U.S.C. §10806(b)(3) and are guilty of "obstruction of monitoring authorized by law."[7] Plaintiff seek declaratory and injunctive relief, and an award of attorneys' fees.

---

[6]/The only records Plaintiff asserts it was denied with respect to these individuals were the mortality review committee reports. Plaintiff does not assert that it was denied access to incident reports or abuse reports with respect to either E.D. or D.H. (Complaint)

[7]/Plaintiff does not allege any statutory reference to support this asserted violation.

3

## DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

9. During the November 1998 elections, Florida elected a Republican, Jeb Bush, to serve as its governor. As a result, on January 5, 1999, Mr. Bush became the Governor of Florida. Thereafter, Governor Bush replaced Edward Feaver as the Secretary of the Department of Children and Family Services. In his place, the Honorable Kathleen Kearney, former Florida circuit court judge, was appointed to be the Secretary of the Department.

10. In the fall of 1998, Myers Kurtz retired as the Administrator of GPW. He was replaced by Thomas V. Sellars.

11. Plaintiff's Complaint contains no allegations of any wrongdoing by Mr. Sellars or Judge Kearney. Specifically, Plaintiff does not allege that Mr. Sellars or Judge Kearney have continued any policy alleged by Plaintiff to be unlawful in this cause.

### A. Mortality Review Committee Reports

12. At GPW, a Mortality Review Committee has been established to:

> ... provide for comprehensive internal reviews of resident deaths. These reviews *assist in the identification of problems within the institution's resident treatment and care delivery system*, provide information that may help prevent future mortalities, and point to areas where staff may need training and education. (Emphasis supplied)

(Exhibit A, GPW Supplement #1 to CF Manual, No. 180-1, pg. 1, §1)

13. As part of any review of a resident death, the Mortality Review Committee members are required to conduct a "thorough clinical record review." That review will include:

> An evaluation of the appropriateness of the care provided by health care and medical staff personnel in terms of recognition of a possible terminal event, and subsequent actions and interventions to prevent death.

(*Id.*, pg. 2, §5.c.)

4

14. At the conclusion of the Mortality Review Committee's deliberation, a report is prepared. (Exhibit B, deposition of Lynda Sommers, pg. 11, lines 10-14) The report is reviewed by the quality assurance manager, the clinical director for the hospital and the hospital administrator. (Exhibit B, pg. 12, lines 3-11)

15. Mortality Review Committee Reports are not provided to anyone outside of GPW. (Exhibit B, pg. 12, line 22 through pg. 13, line 14)

16. Mortality Review Committee Reports provide, among other things, an overview of the patient's treatment at the hospital. (Exhibit B, pg. 14, lines 18 through pg. 15, line 2) The Mortality Review Committee reports are used to evaluate the "medical care (i.e., physical medical care)" provided to clients before their death. (Exhibit B, pg. 18, lines 2-5) In reviewing deaths, the Mortality Review Committee conducts an evaluation of the appropriateness of care provided to the patient in *every* clinical area. (Exhibit B, pg. 22, lines 8-18)

17. One of the purposes of the Mortality Review Committee function is to evaluate and improve the quality of health care rendered by providers of health services at GPW. (Exhibit B, pg. 47, lines 15-18)

18. Mortality Review Committee reports are kept for seven (7) years. At the end of the seven-year period, they are shredded and burned. (Exhibit B, pg. 23, lines 9-11) These records are treated like "peer review" records for purposes of confidentiality at GPW. (Exhibit B, pg. 47, lines 4-7) The Mortality Review Committee, among other things, can make recommendations for further investigation regarding discipline of professional staff. (Exhibit B, pg. 47, lines 8-14)

19. Members of the Mental Health Human Rights Advocacy Committee[8] in District 8 do not have access to Mortality Review Committee reports. (Exhibit D, Deposition of Ben Blau, Ph.D., pg. 25, line 9 through pg. 26, line 14; and Exhibit E, Deposition of Arthur Grossman, pg. 22, line 23 through pg. 24, line 7, pg. 30, line 25 through pg. 32, line 19)

20. Adult Protective Investigators do not have access to Mortality Review Committee reports. (Exhibit F, Deposition of George Glatt, pg. 36, lines 24 through 38, line 13)

21. 42 C.F.R. § 51.41 is a regulation adopted by the Department of Justice to implement or interpret PAIMI, as it relates to access to records' issues. 42 C.F.R. §51.41(c)(4) provides in material part:

> Information and individual records, whether written or in another medium, draft or final, including handwritten notes, electronic files, photographs or video or audio tape records, which shall be available to the P & A system under the Act shall include, but not be limited to:
>
> *       *       *
>
> (4) Reports prepared by individuals and entities performing certification or licensure reviews, or by professional accreditation organizations, as well as related assessments prepared for the facility by its staff, contractors or related entities, *except that nothing in this section is intended to preempt State law protecting records produced by medical care evaluation or peer review committees.* (Emphasis supplied)

---

[8]/The Human Rights Advocacy Committee (HRAC) is created pursuant to §402.166, Fla. Stat. The HRAC is to serve as an independent third-party mechanism for protecting the constitutional and human rights of any client within a program or facility operated, funded, licensed, or regulated by the Department of Children and Family Services. § 402.166(7)(a), Fla. Stat. The HRAC receives and investigates complaints filed by clients of the Department. (Exhibit C, Deposition of Stan Appelbaum, pg. 5, line 23 through pg. 6, line 1, pg. 6, line 21 through pg. 7, line 18)

22. Mortality Review Committees are "medical care evaluation" committees. §766.101, Fla. Stat.

## B. Incident Reports

23. To the extent that Plaintiff sought "incident reports" regarding GPW, there has been from the beginning confusion regarding what Plaintiff sought. GPW is a hospital licensed by the Agency for Health Care Administration. As such, it is required to have in place a system of "incident reporting" to comply with the provisions of Section 395.0197, Florida Statutes. To comply with the statutory requirement, GPW uses "Resident Occurrence Reports." (§395.0197, Fla. Stat.; Exhibit B, pg. 23, line 17 through pg. 26, line 1; and Exhibit G, Resident Occurrence Form) A Resident Occurrence form is completed when any adverse activity occurs at the hospital involving a resident or staff. It includes resident slip and falls. It also includes any injury, deaths, elopements, burns, a fight, an assault, sexual battery, maladaptive behavior, or other complaints. (Exhibit B, pg. 24, lines 7-21)

24. Resident Occurrence reports do not ever leave GPW.[9] (Exhibit B, pg. 25, line 23, through pg. 26, line 1) The records are maintained at the risk management office at GPW for seven years. (Exhibit B, pg. 32, lines 14-20) Thereafter, they are destroyed. (Exhibit B, pg. 32, lines 18-20)

25. Additionally, GPW has a second category of reports, called "unusual incident reports." (Exhibit B, pg. 26, lines 2-6) This report is on a different form than the Resident Occurrence Form. (*Id.*, and Exhibit G, Incident Report) This form is completed whenever

---

[9]/Ben Blau did testify that he could review such reports. (Exhibit D) He did not testify that he ever took copies of such reports from GPW. *Id.*

7

specified types of incidents occur at GPW (e.g., theft, vandalism, damage, client injury or illness, fights, death, disease epidemics, criminal activity by an employee, elopement, sexual assault, a suicide attempt, abuse, neglect or exploitation, or client to client sexual battery). (Exhibit G, and Exhibit H, GPW OP 215-6)

26. The purpose of the Unusual Incident Report is to provide notification of certain events to the District Administrator. (Exhibit H, pg. 3) Copies of this report are also provided to the HRAC. (Exhibit D, pg. 19-21; and Exhibit E, pg. 17-18)

27. Finally, there exists a third type of incident reporting at GPW, the "Serious Reportable Event Report." (Exhibit B, pg. 36, lines 6-8) Such reports address death, suicide, suicide attempts, elopement, escape, self-abuse or serious injury involving more than two stitches, broken limbs and sexual assault. (Exhibit B, pg. 36, lines 9-20)

28. The Serious Reportable Event Report, upon completion, is submitted to the Secretary of the Department of Children and Family Services. Copies are also furnished to the Hospital Administrator, the Assistant Hospital Administrator, the Clinical Director and the Unit Director. (Exhibit B, pg. 37, lines 5-21)

29. The letter attached to Plaintiff's Motion for Summary Judgment (Exhibit 1) was one in a series of communications, both written and oral, between Plaintiff and various attorneys employed by the Department of Children and Family Services and District 8. (Exhibit I, Declaration of Eugenie Rehak[10])

---

[10]/The Declaration which has been filed herewith is a facsimile copy only. The original will be filed with the Court upon receipt.

8

30. On April 29, 1996, Marcia Beach, on behalf of the Advocacy Center, made a written request to David Caldwell that he provide "all institutional incident reports regarding [GPW] for the period from March 1, 1994, through March 31, 1996." David Caldwell is a Human Services Program Supervisor with the Adult Services Program Office in District 8. Ms. Beach apparently had received Mr. Caldwell's name from Anthony DeLuccia, the attorney for GPW. (Exhibit I, ¶ 3)

31. Mr. Caldwell in turn asked Eugenie Rehak, the District Legal Counsel for District 8 to review the April 29, 1996 request. (Exhibit I, ¶4)

32. In May and June 1996, Ms. Rehak communicated at various times with Jason Vail, an Assistant Attorney General familiar with the PAIMI Act, to determine what records maintained by the District 8 administrative office could be released to the Advocacy Center. In July 1996, Ms. Rehak participated in a telephone conference call with Advocacy Center personnel to attempt to clarify the April 29, 1996 records request, as there was confusion as to what records they were requesting from the District 8 administrative offices and the basis for their request. In August 1996, Ms. Rehak consulted with John Slye, the general counsel for the Department, who also consulted with Pat Gleason, an Assistant Attorney General familiar with Chapter 119, Florida Statutes (Florida's Public Records Act), to attempt to further clarify what records could be made available to the Advocacy Center. (Exhibit I, ¶5)

33. After consulting with the general counsel and the Florida Attorney General's Office, corresponding with the Advocacy Center and participating in telephone conversations with the Advocacy Center, Ms. Rehak attempted to cooperate with the Advocacy Center and provide all records maintained at the District 8 administrative office for which there was a

consensus (among the individuals previously noted) that Plaintiff established a legal entitlement. Although the Advocacy Center did not withdraw their broad request (attached to the Motion for Summary Judgment as Exhibit 1), an agreement was reached to provide the Advocacy Center with redacted copies of GPW incident reports filed in the District 8 administrative office, pursuant to District Operating Procedure 215-6. (Exhibit I, and Exhibit A thereto) These incident reports are the "unusual incident reports" described above. (Exhibit G, and Exhibit H, GPW OP 215-6)

34. Initially, Ms. Rehak provided the incident reports with client identifiers, medical information, and other confidential information redacted. (Exhibit I, ¶7, and Exhibit B thereto) This confidential information was redacted because the Advocacy Center's request was ultimately treated as a public records request, because it did not appear that any other statutory provision afforded them access to the records.[11] (Exhibit I, ¶7)

35. At no time in making the request for the above-mentioned incident reports did the Advocacy Center advise Ms. Rehak that they had received any complaint that a specific client had been abused or neglected; that they had probable cause to believe that a specific client had been abused or neglected; or that they had a release from any specific client. (Exhibit I, ¶11)

36. On September 5, 1996, Mr. Basford wrote to former Secretary Feaver and Richard Doran, then the Department's general counsel, and requested that Ms. Rehak's decisions regarding the April 29, 1996, letter be reviewed. Mr. Doran responded to Mr. Basford. (Exhibit

---

[11]/The conclusion that these records were not available under PAIMI authority was predicated on the interpretation of the provisions of Title U.S.C. §§10805 and 10806 described in Defendants' Memorandum of Law in support of this motion.

10

I, ¶8 and Exhibit C thereto) Among other things, Mr. Doran suggested that the Advocacy Center utilize the mediation process provided for in Section 16.60, Florida Statutes to resolve the issues of the Advocacy Center's entitlement to unredacted records. *Id.*

37. Section 16.60, Florida Statutes, provides for a mediation process where a dispute arises as to whether certain records are accessible as public records. *Id.*

38. Thereafter, on October 31, 1996, the Advocacy Center again contacted Ms. Rehak and requested that the additional information in the same incident reports be released based on the provisions of Section 394.4615(4), Florida Statutes.[12] Although this section did not clearly apply to the records at issue, in a spirit of cooperation (and in an effort to make records liberally available to Plaintiff), on December 12, 1996, Ms. Rehak provided the requested incident reports to the Advocacy Center, with only client names redacted. (Exhibit I, ¶9 and Exhibit D thereto)

39. After December 12, 1996, Plaintiff made no further requests of District 8 for incident reports for GPW. (Exhibit I, ¶10)

40. Ms. Gibbons became the Acting District Administrator for District 8 in September 1997. (Exhibit J, Deposition of Frances Gibbons, pg. 5, lines 10-12) The events described in Plaintiff's Complaint (with respect to the request for all incident reports) preceded Ms. Gibbons' employment as the Acting District Administrator. *Id.*, and Exhibit I.

---

[12]/This statutory provision states:

> Information from clinical records may be used for statistical and research purposes if the information is abstracted in such a way as to protect the identity of individuals.

§394.4615(4), Fla. Stat. (1995).

11

41. Plaintiff does not allege that it has directed any further requests for incident reports to District 8, other than those described above. Plaintiff does not allege that any further requests for incident reports were made by Plaintiff to either Judge Kearney or Mr. Sellars. (Complaint)

### C. Abuse Reports

42. Plaintiff alleges that, in 1996, a letter was sent to then Secretary Feaver regarding Plaintiff's right to obtain unredacted abuse and neglect investigation reports. (Complaint, ¶33) Plaintiff further alleges that, on September 17, 1996, a letter was sent to Plaintiff advising Plaintiff that the then general counsel for the Department disagreed with Plaintiff's position that PAIMI created a statutory right of access to abuse and neglect investigation reports. (Complaint, ¶34)

43. As reflected above, Mr. Doran did send a letter to Plaintiff describing the Department's position regarding the provisions of Title 42 U.S.C. §§10805(a)(4) and 10806. The letter provided in pertinent part:

> Section 10806 consistently makes reference to an eligible system obtaining access to records in accordance with §10805(a)(4). Ms. Rehak's opinion is that in order to allow the Department of Health and Rehabilitative Services[13] to release records, the Advocacy Center must therefore be in compliance with one of the three criteria delineated in § 10805(a)(4). This opinion was reached after consultation with my staff and discussion with the Attorney General's legal staff who regularly practice in the area of public records law.

(Exhibit I, and Exhibit C thereto)

---

[13]/The Department of Health and Rehabilitative Services was the predecessor agency to the Department of Children and Family Services.

12

44. Again, Ms. Gibbons was not the Acting District Administrator at the time the above-mentioned letters were sent to the Department. (Exhibit J, Deposition of Frances Gibbons, pg. 5, lines 10-12)

45. On February 11, 1998, Wayne Basford of the Advocacy Center sent a letter to Ms. Rehak and Anthony DeLuccia (counsel for GPW), requesting records relating to E.D. That portion of the request relating to adult protective investigation reports was handled by Ms. Rehak's office. After determining that E.D. was deceased, and had no legal guardian, conservator or other legal representative, and that the Advocacy Center was requesting the record because it had probable cause to believe that abuse or neglect had occurred, Ms. Rehak authorized the release of the record. (Exhibit I, ¶11)

46. Thereafter, the protective investigative file pertaining to E.D. was photocopied and provided to the Advocacy Center on February 23, 1998. Before the records were mailed, they were reviewed and the identity of the reporter (i.e., the individual who reported the abuse or neglect to the Florida Abuse Registry) was redacted, pursuant to Section 415.107(6), Florida Statutes. Except for the reporter identifying information, the entire adult protective investigative file was supplied to the Advocacy Center on February 23, 1998. (Exhibit I, ¶¶11 and 12, and Exhibit E thereto)

47. The protective investigative report contains a narrative which identifies the victim, the perpetrator and other witnesses (or collateral contacts). (Exhibit K, Declaration of David Caldwell[14]) In the protective investigative report, if the reporter provides material or pertinent

---

[14]/The Declaration which has been filed herewith is a facsimile copy only. The original will be filed with the Court upon receipt.

13

information in the investigation, that individual will be identified as a witness or contact. (Exhibit K, ¶8) However, the investigative report will not identify that person as a "reporter." *Id.* In the event that the reporter provided pertinent information during the investigation, the name, address and telephone number of the reporter would be listed, as a witness, along with any other witnesses. (Exhibit K, ¶8)

48. The Department provides adult protective investigative reports, with the reporter name redacted, to the Agency for Health Care Administration and to the pertinent Human Rights Advocacy Committees. These agencies or committees use the reports to investigate complaints related to their areas of responsibility. (Exhibit K, ¶9) Because of the information provided in the report (i.e., the identity of all witnesses with pertinent information), the reports appear to be adequate for the purposes of conducting any necessary further investigation. *Id.*

49. To the extent that Plaintiff asserts, in its summary judgment motion, that it must have the ability to independently investigate the allegations of abuse or neglect, because of a "history" of intimidation of the investigators (Motion, at pg. 13), there is no evidence in the record on summary judgment to support the premise that any such "intimidation" has occurred for at least three years.[15] (Exhibit F, pg. 32, lines 7 through pg. 33, line 22)

---

[15]/This assertion is based on a statement by George Glatt, the supervisor for Adult Protective Investigations in Arcadia, Florida, where GPW is located. Mr. Glatt stated:

> I had the feeling prior to Mr. Kurtz that there was attempts at intimidating our employees, our investigators while conducting G. Pierce Wood investigations.

(Exhibit F, pg. 32, lines 8-11)

Mr. Glatt clarified that this remark was predicated on comments by an investigator formerly employed by the Department, Ellen Davis. (Exhibit F, pg. 32, lines 12-19)

50. Additionally, to the extent that Plaintiff suggests that abuse investigations at GPW are given "special consideration" (Motion, pg. 13), that special consideration is designed to ensure that the investigation and the report is thorough and covers all issues. (Exhibit J, pg. 64, lines 14-18)

### D. Unaccompanied Access

51. Defendants have not contested Plaintiff's assertions in paragraphs 45 and 46 of the Complaint. However, they would note that the described conduct occurred because of the pending litigation in *Johnson v. Kurtz [now Johnson v. Sellars]*, Case Number 87-369-CIV-T-24, pending in the Middle District of Florida, Ft. Myers Division. Although the Advocacy Center has appeared in that action only as *amicus curiae*, Defendants were understandably concerned that any information received by the Advocacy Center during that visit would be shared with the Plaintiffs in *Johnson*,[16] and might become at issue in that law suit. For that reason, Defendants wished to observe the activities of the Advocacy Center, in order to obtain the same information, so that they could adequately defend themselves.[17]

---

Additionally, Mr. Glatt further clarified that this occurred prior to Mr. Kurtz becoming administrator of GPW in late 1995. (Exhibit F, pg. 33, lines 15-22) Further, there were no complaints whatsoever regarding efforts to intimidate any protective investigators after late 1995, when Mr. Kurtz became the administrator at GPW. (Exhibit F, pg. 50, lines 19-23)

[16]/The "lines" between the Advocacy Center and the monitor in *Johnson*, for example, have become somewhat blurred. Ms. Rowe, the Unit Director of the Advocacy Center for PAIMI, was previously a monitor in *Johnson*. (Plaintiff's Exhibit 3, pg. 2)

[17]/Although Plaintiff, with their Motion for Summary Judgment, presents declarations suggesting that the presence of Department staff might intimidate clients, no evidence has been presented that any client has actually been intimidated as a result of the "accompanied access" to GPW afforded by Defendants.

15

52. Plaintiff has neither pled in a factually specific manner, nor proven that the denial of unaccompanied access to GPW caused any actual adverse impact on their investigation of E.D.'s death. Further, they allege no factually specific harm to any client at GPW, as a result of the denial of unaccompanied access. (Complaint)

53. Plaintiff has neither pled nor proven that the denial of access to incident reports or abuse reports has resulted in any harm to any client at GPW. (Complaint)

## ARGUMENT

Plaintiff's Complaint should be dismissed for the following reasons:

a. Plaintiff fails to allege or demonstrate standing to sue Judge Kearney, Frances Gibbons and Thomas V. Sellars for injunctive or declaratory relief;

b. Plaintiff lacks standing to sue Defendants for the failure to provide unredacted incident reports and abuse reports;

c. Plaintiff fails to assert a deprivation of a right, privilege or immunity, and, therefore, asserts no violation of Title 42 U.S.C. §1983;

d. To the extent that Plaintiff seeks Mortality Review Committee Reports, PAIMI has not been interpreted to require the production of such reports; and

e. To the extent that Plaintiff sues to obtain unredacted incident reports and abuse reports generally, Plaintiff fails to allege or prove a basis for relief.

WHEREFORE Defendants move this Honorable Court to enter an order dismissing Plaintiff's complaint.

Respectfully submitted,

ROBERT A. BUTTERWORTH
ATTORNEY GENERAL

STEPHANIE A. DANIEL
Assistant Attorney General
Fla. Bar. No. 332305

Fla. Attorney General's Office
The Capitol, Suite PL01
Tallahassee, FL 32399-1050
Tele. No.: (850)414-3300
Fax No.: (850)488-4872

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been sent by United States Mail to **WAYNE H. BASFORD, ESQUIRE,** and **PETER L. NIMKOFF, ESQUIRE**, at the Advocacy Center for Persons with Disabilities, Inc., 2671 Executive Center Circle West, Suite 100, Tallahassee, Florida 32301-5092, **HELIA MARIA GARRIDO HULL, ESQUIRE**, at the Advocacy Center for Persons with Disabilities, Inc., 198 Wilshire Boulevard, Casselberry, Florida 32707, and **BONITA M. RIGGENS, ESQUIRE**, at 501 1st Avenue North, Suite 629, St. Petersburg, Florida 33701, this 8th day of February, 1999.

Stephanie A. Daniel
Assistant Attorney General